UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| WORLD WAR II THEATRE, INC. | CIVIL ACTION |
| VERSUS | 19-11187 |
| DESIMONE CONSULTING ENGINEERING GROUP, LLC, ET AL. | SECTION: "J" (5) |

## ORDER & REASONS

Before the Court are two *Motions to Exclude Expert Testimony* filed by Plaintiff World War II Theatre, Inc. **(Rec. Doc. 74)** and by Defendants DeSimone Consulting Engineering Group, LLC and William R. O'Donnell **(Rec. Doc. 75)**. The motions are opposed (Rec. Docs. 76, 77). Having considered the motions and memoranda, the record, and the applicable law, the Court finds that Plaintiff's motion should be **GRANTED in part** and Defendants' motion should be **DENIED**.

## FACTS AND PROCEDURAL BACKGROUND

This is a construction dispute between Plaintiff, the owner of the project, a hotel adjacent to the National World War II Museum in New Orleans, Louisiana, and Defendants DeSimone Consulting Engineer Group, LLC ("DeSimone") and William R. O'Donnell, DeSimone's designated representative for the project. Plaintiff hired Nichols Brosch Wurst Wolfe & Associates (the "Architect") as the architect of the project, who in turn hired DeSimone as a consultant. Plaintiff contends that DeSimone and O'Donnell were grossly negligent in designing and supervising

construction of the project, resulting in extensive delay and expenses as well as lost revenue.

After construction began in December 2017, Plaintiff's general contractor, Palmisano Contractors ("Palmisano") noticed that steel beams on the second floor appeared to be sagging during a site visit on April 25, 2018, and notified Defendants, who confirmed that the beams were undersized and also discovered that the third floor wall system lacked adequate beam support. Defendants acknowledged that these issues were due to structural design errors and issued drawings to remedy the deficiencies, which were released to Palmisano as Construction Change Directive No. 3 (hereinafter "CCD-3").

On August 8, 2018, Palmisano advised Defendants that another beam was visibly deflecting. Six days later, Defendants directed Palmisano to stop loading the wall at issue. On August 30, 2018, Defendants advised Plaintiff that they had confirmed more than 25 additional locations with undersized support beams, and between September 8 and October 29, 2018, Defendants issued a series of repair designs for 29 separate locations (collectively, "CCD-6"). The project achieved substantial completion 117 days later than originally planned, on October 11, 2019.

In this litigation, Plaintiff brings a claim of gross negligence against Defendants and their insurers. The Court previously denied Defendants' motion for summary judgment that sought to dismiss Mr. O'Donnell from the case, finding that Plaintiff could not prospectively waive liability for gross negligence.[1]

---

[1] (Rec. Doc. 50).

With the instant motions, Defendants seek to exclude Plaintiff's delay expert and Plaintiff seeks to exclude certain opinions of Defendants' expert on the standard of care. The Court held oral argument on Defendants' motion on March 10, 2021.

## LEGAL STANDARD

Federal Rule of Evidence 702 provides that a witness who is qualified as an expert may testify if: (1) the expert's "specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the expert's testimony "is based on sufficient facts or data"; (3) the expert's testimony "is the product of reliable principles and methods"; and (4) the principles and methods employed by the expert have been reliably applied to the facts of the case. FED. R. EVID. 702. The United States Supreme Court's decision in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), provides the analytical framework for determining whether expert testimony is admissible under Rule 702. Both scientific and nonscientific expert testimony are subject to the *Daubert* framework, which requires trial courts to make a preliminary assessment of "whether the expert testimony is both reliable and relevant." *Burleson v. Tex. Dep't of Criminal Justice*, 393 F.3d 577, 584 (5th Cir. 2004); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). When expert testimony is challenged under *Daubert*, the party offering the expert's testimony bears the burden of proving its reliability and relevance by a preponderance of the evidence. *Moore v. Ashland Chem. Co.*, 151 F.3d 269, 276 (5th Cir. 1998).

The reliability of expert testimony "is determined by assessing whether the reasoning or methodology underlying the testimony is scientifically valid." *Knight v.*

*Kirby Inland Marine Inc.*, 482 F.3d 347, 352 (5th Cir. 2007). A number of nonexclusive factors may be relevant to the reliability analysis, including: (1) whether the technique at issue has been tested; (2) whether the technique has been subjected to peer review and publication; (3) the potential error rate; (4) the existence and maintenance of standards controlling the technique's operation; and (5) whether the technique is generally accepted in the relevant scientific community. *Burleson*, 393 F.3d at 584. The reliability inquiry must remain flexible, however, as "not every *Daubert* factor will be applicable in every situation; and a court has discretion to consider other factors it deems relevant." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004); *see also Runnels v. Tex. Children's Hosp. Select Plan*, 167 F. App'x 377, 381 (5th Cir. 2006) ("[A] trial judge has considerable leeway in determining how to test an expert's reliability.").

With respect to the relevancy prong, the proposed expert testimony must be relevant "not simply in the way all testimony must be relevant [pursuant to Rule 402], but also in the sense that the expert's proposed opinion would assist the trier of fact to understand or determine a fact in issue." *Bocanegra v. Vicmar Servs., Inc.*, 320 F.3d 581, 584 (5th Cir. 2003). Ultimately, a court should not allow its "gatekeeper" role to supersede the traditional adversary system, or the jury's place within that system. *Scordill v. Louisville Ladder Grp., LLC*, No. 02-2565, 2003 WL 22427981 at *3 (E.D. La. Oct. 24, 2003). As the Supreme Court noted, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence."

*Daubert*, 509 U.S. at 596. Generally, questions relating to the basis and sources of an expert's opinion rather than its admissibility should be left for the jury's consideration. *United States v. 14.38 Acres of Land*, 80 F.3d 1074, 1077 (5th Cir. 1996) (citing *Viterbo v. Dow Chemical Co.*, 826 F.2d 420, 422 (5th Cir. 1987)).

## DISCUSSION

### I. DEFENDANTS' MOTION TO EXCLUDE PLAINTIFF'S DELAY EXPERT

Defendants contend that the opinions of Plaintiff's expert, David E. Pearson, are unreliable because they are contrary to industry standard. Specifically, Defendants contend that Pearson (1) failed to use a critical path method of analysis ("CPM"), (2) ignored the projected completion dates of Palmisano's schedule, and (3) failed to assess delays separately and in chronological order. Defendants contend that Pearson used a method known as "as-built critical path" analysis, which is distinct from CPM and, Defendants argue, less reliable.

To the extent Pearson used this as-built critical path analysis, which Plaintiff disputes, Defendants have not shown that the method is so unreliable as to make Pearson's testimony inadmissible. Defendants' own expert has stated that the as-built critical path analysis "intuitively makes sense as a way to comply with the dictate that extension of overall project completion provides the touchstone for any compensable delay analysis." W. Stephen Dale & Robert M. D'Onofrio, Construction Schedule Delays § 9:1 (2020). He continued:

> [F]or litigants debating compensability after project completion, the method has some attraction. In that context, the as-built critical path method does not suffer from the same critical infirmities of methods like the impacted as-planned or the total time approach. Indeed, where the

project schedule was abandoned or is demonstrably and fundamentally inaccurate, the as-built critical path may offer a viable approach.

*Id.* Further, Defendants' assertion that as-built critical path analysis has "the lowest acceptance rate of any methods"[2] is misleading and not an accurate representation of the source (which is the same Dale & D'Onofrio treatise cited above). Dale and D'Onofrio did not find that as-built critical path had the lowest acceptance rate; a different method, known as "windows wide periods," had an acceptance rate of 0% (versus 15% for as-built critical path). *Id.* § 12:3. They ranked the as-built critical path method fifth out of seven different methods in terms of general preference by engineers. *Id.* §12:2. They also referenced another study that found the as-built method to be more credible than Defendants suggest:

> The study generally identified five major schedule delay methods then attached a number from 1 to 5 to each method reflecting that method's acceptability by courts and boards where a 5 denoted acceptance with credible data, a 3 represented some method acceptance but bad data, and a 1 represented a finding of a flawed method. The study conclusion in order of average legal acceptability by method (on a scale from 1 to 5) was:
>
> (1) Time impact analysis—3.83
> (2) Collapsed as-built—2.60
> (3) As-built critical path—2.57
> (4) Impacted as-planned—1.50
> (5) As-planned versus as-built/total time—1.44.

*Id.* § 12:3 (citing David Arditi & Thanat Pattanakitchamroon, Analysis Methods in Time-Based Claims, 134 No. 4 ASCE J. Constr. Eng'g & Mgmt. 242 (Apr. 2008)).

Additionally, "legal acceptance" here means given greater weight by the factfinder, as most of these cases appear to be either bench trials or administrative

---

[2] (Rec. Doc. 75-1, at 6).

decisions, and often turned on the method to which it is compared.[3] For instance, in *K-Con Building Systems, Inc. v. United States*, 131 Fed. Cl. 275, 329-30 (2017), the court credited the as-built critical path method over the "as-planned vs. as-built" method because that method did "not fully reflect the reality of what occurred on the project." Despite their assertion at oral argument, Defendants have not identified any instances where a court held that testimony based on as-built critical path analysis was inadmissible. Courts routinely consider testimony based on this methodology and determine what weight to give it based on the other evidence presented. *See, e.g.*, *K-Con*, 131 Fed. Cl. at 329-30.

In sum, Defendants have shown only that the parties' experts disagree on the proper calculation of delay in this matter. This does not establish that Pearson's testimony is inadmissible but only that there is a credibility question, which is the province of the jury. Accordingly, Defendants' motion will be denied.

## II. PLAINTIFF'S MOTION TO EXCLUDE OPINIONS OF DEFENDANT'S EXPERT ON STANDARD OF CARE

Plaintiff seeks to prevent Defendant's expert, James Crawford, from testifying to the following: (1) the structural design errors by O'Donnell and DeSimone were not a gross deviation from the standard of care; (2) the standard of care did not require a review of the entire design after the first set of errors were discovered in April 2018; and (3) the beam stress calculations prepared by DeSimone in 2021 support his

---

[3] Dale & D'Onofrio acknowledge as much: "[N]early every method has been both accepted and not accepted based on the specifics of an individual case." Dale & D'Onofrio, *supra*, § 12:3.

7

opinion that O'Donnell and DeSimone took appropriate steps to assess beam stress in August 2018. The Court considers each in turn.

### A. Crawford's Opinion that There Was No Gross Deviation from the Standard of Care

Crawford reasoned that Defendants' errors were not a gross deviation from the standard of care because they were unintentional, identified by the general contractor and acknowledged by DeSimone, and remediated without death or physical injury. Plaintiff contends that a gross deviation need not be intentional, and that this opinion is not supported by any engineering principle or authority.

Defendants assert that the appropriate standard of care for engineers is to acknowledge and correct errors, citing the National Society of Professional Engineers Code of Ethics § III.1.a ("Engineers shall acknowledge their errors and shall not distort or alter the facts.").[4] However, this only speaks to whether Defendants' response to their errors constituted a gross deviation; Plaintiffs contend that the design errors themselves constitute a gross deviation and that Crawford provides no analysis on this point.

In his report, Crawford identifies the following causes of the design errors: a "computer design input mistake . . . that could be easily made and overlooked," a "communication error . . . apparently occurring at the shop drawing phase," and a second "communication error" that "was caused by a lack of follow through by [DeSimone] to a change in the original design concept."[5] However, Crawford provides

---

[4] Available at https://www.nspe.org/resources/ethics/code-ethics (last visited March 9, 2021).
[5] (Crawford Report, Rec. Doc. 74-12, at 9).

8

almost no analysis on how these design errors happened; his only comment on this point is that the errors were "unintentional."[6] He instead spends the bulk of his report addressing whether the error underlying CCD-6 posed a life safety issue and, accordingly, whether Defendants appropriately responded once they were informed of the error. The Court finds that Crawford's opinion that the design errors were not a gross deviation from the standard of care is not supported by reliable principles or sufficient facts and therefore should be excluded.

### B.   Crawford's Opinion that a Full Review Was Not Necessary

Crawford opined that a full review was not warranted after the first errors (CCD-3) were discovered because (1) "[o]n the design drawings, beam sizes are shown in relatively small print making a pattern identification at least somewhat more difficult," (2) the errors were "caused by a computer design input mistake . . . that could be easily made and overlooked" and by "a communication error," (3) the work to fix the errors "was minimally disruptive to ongoing construction," and (4) DeSimone "had no reason to believe that CCD-3 constituted anything more than minor and isolated errors that did not require a full review of their analysis models and drawings."[7] Plaintiff contends that this opinion should be excluded because it is not based on sufficient facts and conflicts with O'Donnell's sworn testimony.

In his report, Crawford stated: "It is our conclusion, *and we confirmed the same with [DeSimone]*, that [DeSimone] had no reason to believe that CCD-3 constituted

---

[6] *Id.* at 14.
[7] *Id.* at 9.

9

anything more than minor and isolated errors that did not warrant a full review of their analysis models and drawings."[8] However, O'Donnell testified:

> Q. In the spring of 2018 did you take any steps to determine whether there were any other errors or issues with the structural design of the Higgins Hotel?
>
> A. I asked the team to. I'm sure I have, I don't have a specific recollection, but typically when you have a problem you check your design.[9]

Additionally, Plaintiff has submitted an email from the Architect to O'Donnell asking him to "please review with your team to identify if there are any other issues that we can address before any further complications."[10] Further, as Plaintiff points out, Crawford fails to explain his conclusions that the errors underlying CCD-3 were "minor" or that the work to repair them was "minimally disruptive."[11] Contrary to Crawford's opinion, O'Donnell testified:

> Q. Would the hotel have been structurally sound if the construction had continued to completion without the repair work performed pursuant to CCD-3?
>
> A. No.
>
> . . . .
>
> Q. Okay. Could the hotel or could parts of the hotel have experienced a catastrophic super-structure failure if the errors at issue in CCD-3 and -6 had not been caught and rectified?
>
> A. Well, you know, that's a good question. Clearly in the CCD-3 work, that girder had to be there to support the loads from the Infinity structure, so I mean that was, that absolutely had to be in place, right,

---

[8] *Id.* at 7 (emphasis added).
[9] (O'Donnell Deposition, Rec. Doc. 74-3, at 12).
[10] (Rec. Doc. 74-4, at 1).
[11] (*See* Crawford Report, Rec. Doc. 74-12, at 3, 7, 9).

> because you can't bear a bearing wall when there is no direct support below it.
>
> . . . .
>
> So is it possible? Maybe. But you know, the fact of the matter is you don't want to count on those kinds of things to have a safe building. You want, you need to have it code compliant and stout and strong.[12]

Moreover, common sense dictates that discovery of an error "that could be easily made and overlooked" because it was "in relatively small print" warrants increased scrutiny. Accordingly, the Court holds that this opinion should be excluded because it lacks a sufficient factual basis.

### C. Crawford's Opinion that DeSimone's Back Calculations Support His Conclusions

Crawford concluded that the beam deflection underlying CCD-6 did not present a life safety issue based on the actual (measured) deflection of one inch, which was within the normal range of deflection, and found that this was verified by beam stress calculations performed by DeSimone in January 2021. Plaintiff contends that Crawford should not be allowed to rely on these calculations because they are not relevant and Crawford did not independently confirm them.

The Court finds this argument unavailing. As Plaintiff puts it, "[t]he relevant inquiry is whether DeSimone acted appropriately at the time the deflecting beam was identified on August 8, 2018."[13] When the deflecting beam was identified, Defendants used the measured amount of deflection to determine whether it posed a life safety issue and concluded it did not. The beam stress calculations, according to Crawford,

---

[12] (O'Donnell Deposition, Rec. Doc. 74-3, at 23-24).
[13] (Rec. Doc. 74-1, at 15).

confirm that this conclusion was correct. Thus, the calculations are relevant because they tend to suggest that DeSimone acted appropriately after being notified of the deflecting beam. Additionally, Plaintiff has not shown that the calculations themselves are unreliable or that Crawford otherwise erred in using them. Plaintiff's motion will be denied as to this opinion.

## CONCLUSION

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's *Motion to Exclude Certain Testimony of James W. Crawford, Jr.* **(Rec. Doc. 74)** is **GRANTED in part** and **DENIED in part**. The motion is **GRANTED** as to Crawford's opinions that the design errors were not a gross deviation from the standard of care and that the standard of care did not require a full review after the first set of errors were discovered. The motion is **DENIED** as to Crawford's opinion regarding DeSimone's beam stress calculations.

**IT IS FURTHER ORDERED** that Defendants' *Motion to Exclude Testimony of David E. Pearson* **(Rec. Doc. 75)** is **DENIED**.

New Orleans, Louisiana, this 8th day of April, 2021.

_____
CARL J. BARBIER
UNITED STATES DISTRICT JUDGE